EVELYN NICHOLS, ADMINISTRATRIX (ESTATE OF GERALD NICHOLS), ET AL. *v.* COPPOLA MOTORS, INC.

RICHARD KEYS *v.* COPPOLA MOTORS, INC.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

336

Argued March 7—decision released July 17, 1979

*Ivan A. Hirsch,* with whom, on the brief, was *Edgar Krentzman,* for the appellant (defendant in each case).

*Richard A. Bieder,* with whom was *Lucy V. Katz,* for the appellees (plaintiffs in the first case).

*John M. Creane,* for the appellee (plaintiff in the second case).

COTTER, C. J.   These cases, which were tried together to a jury and consolidated for purposes of appeal, arose out of an automobile collision with a utility pole on Stratford Avenue in Bridgeport in which three persons were injured and one died as a result of injuries alleged to have been received in the accident.   The plaintiffs in the first case are Jon Sumpter, Gerald Bush and Evelyn Nichols, the

administratrix of the estate of her deceased son, Gerald Nichols. Sumpter, Bush and Gerald Nichols were, at the time of the collision, passengers in a car operated by Richard Keys, the plaintiff in the second case. The defendant in both cases, Coppola Motors, Inc., is the automobile dealer from whom Keys purchased the car involved in the accident.

From the evidence presented, the jury could reasonably have found the following: On August 29, 1973, Keys took delivery of a used 1967 Pontiac Tempest station wagon which he purchased from the defendant. Two days after he had bought the car, Keys brought it back to the defendant where he complained to Donald Mercier, the salesman who had sold him the car, that there was noise and whining in the transmission, the engine was running hot and lacking power, the transmission was leaking, the muffler had been wired up, and the car was without a spare tire and had not been cleaned. In response to those complaints, Mercier had a mechanic test drive the car with Keys, after which Mercier told Keys to keep the car over the Labor Day weekend and return with it later.

At approximately 4 a.m. on September 2, 1973, with Nichols, Sumpter and Bush as passengers, Keys was operating the station wagon in an easterly direction on Stratford Avenue in Bridgeport when he moved to the center of the road and applied his brakes in order to avoid an approaching, speeding vehicle on his right. The brakes failed to hold and the brake pedal went down to the floor so that part of Keys' foot was on the gas pedal at the same time. The car hit an esplanade in the road, then collided with a telephone pole and came to rest.

The complaint in the first case was in four counts: express warranty, implied warranty, strict tort liability and negligence. In the second action, brought by the plaintiff Keys, a claim of negligence was withdrawn and it was presented to the jury only on the allegations of express and implied warranty and strict tort liability. The jury returned general verdicts against the defendant in favor of the administratrix of the estate of the decedent, Gerald Nichols, in the amount of $230,000; for Gerald Bush in the amount of $30,000; in favor of Jon Sumpter in the amount of $15,000; and for Richard Keys in the amount of $60,000. Upon the refusal of the court to set aside the verdicts, the defendant appealed from the judgments rendered therein.

In these combined appeals, the defendant raises three claims of error applicable to each case: (1) the court erred in charging the jury that they could draw an unfavorable inference from the defendant's failure to call a witness; (2) the court erred by disclosing to the jury the fact that the defendant had requested a charge on damages for wrongful death; and (3) the court erred in refusing to set aside the verdicts as excessive. As to the second case only, involving the plaintiff Keys, the defendant claims error in the trial court's refusal to charge the jury that speed in excess of the posted speed limit would constitute prima facie evidence of excessive speed.

I

In the course of the trial, a substantial portion of the evidence was obviously directed toward establishing the defective condition of the brakes on Keys' automobile when it was purchased and at the

time when the accident occurred; whether the defendant was or should have been aware of a defect in the braking system; and whether the cause of the accident was attributable to such a defect.

Robert Cromwell, offered as an expert witness by the plaintiffs, testified that his examination of the vehicle showed that the brakes were so defective at the time of the accident as to create an inherently dangerous condition, and that it would have taken at least 1000 miles for the brakes to deteriorate from a safe condition to the condition which he found existed on the day of the accident.[1] Cromwell concluded that based on his examination of the vehicle, photographs of the scene, and a personal inspection of the area of the accident, the defective brakes were a substantial contributing cause of the accident. William Juechter, an expert offered by the defendant, testified that, based on his examination of the photographs and diagrams in evidence, the Keys vehicle was moving in a straight line after the brakes were applied; the wheels were locked; the vehicle was travelling at a higher speed at the start of the skid than at the time it struck the pole; and he found no evidence of a mechanical malfunction of the brakes at the time of the accident.

In addition, the plaintiffs presented evidence that, prior to the delivery of the vehicle to Keys, the defendant failed to adequately inspect the brakes;[2]

---

[1] Through the evidence presented, the plaintiffs sought to establish that the Keys vehicle had been driven only about 325 miles from the date of purchase to the date of the accident.

[2] In this regard, the plaintiffs put in evidence to show that the predelivery inspection of the car was not extensive; they also put in issue whether the repair order for that initial inspection was altered after the accident.

and that when Keys brought the car back to Coppola Motors, Inc., two days later, his complaint to Mercier about "transmission noise" could have been based upon noise actually caused by the grinding of worn-out brakes. The defendant countered with evidence tending to show that the vehicle was in fact inspected by the defendant's used car manager prior to delivery; but, although it did not deny that Keys returned two days later and complained to Mercier, the defendant's used car manager claimed he had no recollection of the return of the vehicle.

In view of the above evidence, the trial court instructed the jury regarding the permissibility of drawing an adverse inference from the failure of the defendant to call Donald Mercier as a witness.[3] This portion of the charge is reprinted in its entirety in the footnote.[4]

"If a party fails to call a witness, then the *Secondino* rule permits the jury to draw an infer-

---

[3] The court also gave a *"Secondino* charge" at the defendant's request. *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598.

[4] "[Attorney Richard A.] Bieder's request in the course of the argument of this case, attention was called to the failure to call certain witnesses who it was claimed might by their testimony have thrown light upon the situation before you. Where a party fails to call to the stand a witness who is within his power to produce and who would naturally have been produced by him, you are entitled to infer that had he testified, that testimony would have been unfavorable to the party failing to call him, and to consider that fact in arriving at your decision.

"However, requirements for such an inference that he could furnish material evidence, is that the witness must be available, and he must be a witness whom the party would naturally call. It is a witness who would naturally be produced by a party which is one known to that party and by reason of his relationship to that party or to the issues or both, could reasonably be expected to have peculiar or superior information which was material to the case which a favorable party would produce but hasn't, the failure of a party to call a person

ence that the witness's testimony would have been unfavorable to the party's cause if the jury first finds that: (1) the witness was available; and (2) the witness was one the party would naturally produce. *Bell* v. *Bihary,* 168 Conn. 269, 271, 362 A.2d 963; *Raia* v. *Topehius,* 165 Conn. 231, 237, 332 A.2d 93; *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598. To charge the jury on the rule, the party claiming the benefit of the rule must show that he is entitled to it. *State* v. *Brown,* 169 Conn. 692, 704, 364 A.2d 186; *Raia* v. *Topehius,* supra; *Queen* v. *Gagliola,* 162 Conn. 164, 169, 292 A.2d 890." *Doran* v. *Wolk,* 170 Conn. 226, 229, 365 A.2d 1190.

The defendant first claims that the trial court erred in giving the instruction on the ground that the plaintiffs failed to prove Mercier's availability. As noted above, whether Mercier was an available witness was a factual question for the jury to determine as a condition precedent to drawing any

as a witness who is available, and you must find all these elements present in the record, to both parties, and who does not stand in such a relationship to the party in question or to the issues, so that the party would naturally be expected to produce him if his testimony was favorable affords no basis for unfavorable inference.

"The plaintiff, Keys, testified that he spoke with Mr. Mercier, a used car salesman at Coppola two days after purchasing the car, and claims that Mr. Mercier is a witness whom Coppola Ford would naturally be expected to call because of his relationship with Coppola Ford and the fact that the plaintiff driver spoke with him regarding the functioning of the Ford, not necessarily about the brakes in this case because on this occasion he complained of noises in the motor and the transmission; so I charge you that since Coppola did not call Mercier to testify, you may infer that the reason he was not called was because his testimony would have been unfavorable to defendant.

"It is not enough for defendant, Coppola, that plaintiff could have produced Mr. Mercier by subpoena. He was a witness whom the defendant, Coppola, would normally have called."

adverse inference from his absence. Although the availability of a witness is a fact to be shown by the party seeking the benefit of the inference; *Fontaine* v. *Coyle,* 174 Conn. 204, 209, 384 A.2d 616; nevertheless, since the question of availability is a factual determination to be made by the trier, the plaintiffs were simply required to satisfy their burden of producing evidence sufficient to warrant the requested charge. Cf. *Raia* v. *Topehius,* 165 Conn. 231, 237, 332 A.2d 93; *Queen* v. *Gagliola,* supra. The correctness of the charge is determined by the claims of proof of the parties. *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 586, 356 A.2d 873; Maltbie, Conn. App. Proc. § 145.

Availability may be shown or determined not only from mere physical presence or accessibility for service, but also from the relationship, usefulness or nature of the expected testimony and this means only that the witness is in such relationship with the party that it is likely that his presence could be procured. *Grady* v. *Collins Transportation Co.,* 341 Mass. 502, 504–505, 170 N.E.2d 725; cf. *Thomas* v. *Ganezer,* 137 Conn. 415, 423, 78 A.2d 539; 29 Am. Jur. 2d, Evidence § 180.

In addition to the evidence noted previously, the plaintiffs presented testimony, albeit not entirely unequivocal, from which the jury could have found that Mercier was a used car salesman for the defendant in the summer of 1973 and that he was in fact still employed by it at the time of trial. Under those circumstances, we cannot agree with the defendant that the plaintiffs failed to sustain their burden of presenting evidence as to Mercier's availability.

We similarly reject the defendant's claim that the plaintiffs failed to establish that Mercier was

a witness the defendant would naturally be expected to produce. "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598. As with the question of availability, it is for the jury to determine, from the evidence presented, whether the absent witness' testimony would be material or substantial to the case as a condition precedent to drawing an adverse inference. *Fontaine* v. *Coyle,* supra; *Bell* v. *Bihary,* 168 Conn. 269, 272, 362 A.2d 963.

It is undisputed that Mercier was the employee of the defendant who sold the vehicle to Keys. See *Lemmon* v. *Paterson Construction Co.,* 137 Conn. 158, 163, 75 A.2d 385. As such, he could reasonably be expected to have information relating to the condition of the car when it was delivered as well as knowledge of the extent of the predelivery "safety check" done on the vehicle. As noted previously, there was evidence that Keys spoke to Mercier regarding complaints about the vehicle two days after the sale, and that it was Mercier who had a mechanic test drive the car and who told Keys to keep it over the weekend. Both the defendant's used car sales manager and the general manager, who were called as adverse witnesses by the plaintiffs, did not remember whether the Keys vehicle was ever returned to the defendant after the sale. And finally, since the plaintiffs presented testimony indicating that the defendant's used car salesmen drove such cars for their private purposes, Mercier might reasonably be expected to have had informa-

tion relating to the mileage on the vehicle when it was delivered to Keys.[5]

Under all the circumstances, we cannot say that there was insufficient evidence from which the jury could find that Mercier was a witness the defendant would naturally be expected to produce.

The defendant's final claim of error with respect to the so-called *Secondino* charge is that "the court erroneously instructed the jury *as a matter of law* that Mercier was a witness whom the defendant would naturally have called." (Emphasis added.) The short answer to this argument is that the defendant's objection to the charge failed to specifically raise this claim as a ground for its objection so as to ensure that the trial court might have an opportunity to cure any defect or ambiguity in the charge. Practice Book, 1978, § 315; *Duggan* v. *Esposito,* 178 Conn. 156, 160–61, A.2d ; *Tough* v. *Ives,* 162 Conn. 274, 286, 294 A.2d 67. The defendant's exception,[6] while raising the issues of Mercier's availability and whether he could reasonably have been expected to testify as to matters

---

[5] The evidence indicated that the mileage written on the bill of sale was a figure recorded when the car was first acquired by the defendant. Consequently, the issue arose whether the difference in the car's mileage at the time of the accident was entirely attributable to Keys.

[6] The defendant's exception was as follows: "The witnesses we asked Your Honor to charge about were witnesses identified by name, and identified as to availability and identified as to what purposes they were withheld and all were relevant in the eyes of this case and it was proper to ask for this charge to Mercier without any question of relevancy. What could he testify to in this case when the plaintiff Keys said to him, the transmission makes noise, the radiator overheats, the car was dirty, and he lacked a spare tire; and how could that possibly be relevant in this case and it leaves an imposition to the jury that our failure to call Mr. Mercier would be to our detriment and no evidence was presented to this Court that Mercier was ever available."

relevant to the case, did not properly direct the trial court to the last sentence of the charge[7] which, it is now claimed, improperly left the jury with the impression that, as a matter of law, Mercier *was* a witness the defendant would naturally have produced.

Despite the defendant's failure to object specifically to that portion of the charge which it now argues was erroneous, it is signficant to note that, aside from the statement to which the defendant objects, the trial court clearly and properly instructed the jury that, in order to be permitted to draw an adverse inference from a party's failure to call a witness, they first must find that the requisite elements were shown to have existed.

## II

The defendant next claims that the court committed reversible error when, following its charge on damages for wrongful death, the court made the jury aware of the fact that the defendant had requested such a charge. The incident in question arose when the court attempted to elicit from defense counsel whether the charge given substantially complied with his request.[8] Once defense

---

[7] See footnote 4, supra.

[8] "The Court: You submitted a request to charge in a death case, I believe, and I don't recall whether it was any different, but it seemed to me that it was substantially similar.

"Mr. Krentzman: It is certainly different from the one that you just charged, Your Honor, yes.

"The Court: Well, I will see if I can locate it. Do you have a copy of that?

"Mr. Krentzman: It was on file, if Your Honor, please.

"Mr. Bieder: It starts with 23. It is number 23.

"The Court: Well, Mr. Krentzman, in his request to charge, says it a little differently but I think it is substantially the same."

The Court then proceeded to give a subsequent charge on damages for wrongful death.

counsel indicated his displeasure with the charge, the court further instructed the jury on damages for wrongful death. The defendant argues that the identification of the defendant as requesting such a charge on damages for wrongful death and the repetition of a charge on this subject was misleading and unduly prejudicial to the defendant in that it implied the defendant had in some way conceded liability and it unnecessarily emphasized the testimony of the plaintiff's expert on lost earnings which was referred to in that portion of the charge.

In *Gorham* v. *Farmington Motor Inn, Inc.,* 159 Conn. 576, 582, 271 A.2d 94, we made the following observations in the context of a similar claim: "Although we do not approve of such a procedure, in the absence of anything incorrect at law the giving of requests in this manner is not in itself reversible error, unless the jury were misled; see *Bridgeport L. A. W. Corporation* v. *Levy,* 110 Conn. 255, 262, 147 A. 841; nor does the fact that the court was mistaken occasionally as to which party requested a given charge require reversal. A charge is examined to see if it fairly presented the case to the jury in such a way that no injustice was done to the legal rights of the litigants; it is not examined in a manner which would search out technical flaws or inexact, inadvertent or contradictory statements. *Borsoi* v. *Sparico,* 141 Conn. 366, 371, 106 A.2d 170; *Pratt, Read & Co.* v. *New York, N.H. & H. R. Co.,* 102 Conn. 735, 740, 130 A. 102."

In the present case, the defendant does not allege error in the charge on damages, nor was the court mistaken as to who had requested that charge. Although the trial court in *Gorham* v. *Farmington*

*Motor Inn, Inc.,* supra, 582–83, gave a supplemental charge to the jury pointing out the irrelevancy of which party had requested a charge, in his objection the defendant here neither specifically pointed out the claim which he now raises on appeal nor requested a clarifying instruction.

It is clear from an examination of the entire charge that the jury were repeatedly, fairly and accurately apprised of the fact that a determination of damages could be made only if they had first found for the plaintiffs on the issue of liability; and that if their verdicts were for the defendant, a determination of damages would not be made. We cannot conclude under the circumstances that the court's reference that the defendant requested the charge in issue misled the jury. *Gorham* v. *Farmington Motor Inn, Inc.,* supra. That the charge itself was repeated in response to the defendant's comments did not render an otherwise unobjectionable charge erroneous on the ground that it gave a particular feature of the evidence an undue prominence. See *Kosko* v. *Kohler,* 176 Conn. 383, 389–90, 407 A.2d 1009; *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 591, 356 A.2d 873.

### III

As to the second case, the defendant contends that the court erred in failing to charge the jury that speed in excess of the posted speed limit would constitute prima facie evidence of excessive speed.

This case, as previously noted, was submitted to the jury on the plaintiff's allegations of express and implied warranty and strict tort liability as con-

tained in separate counts of his complaint. As in the first action, the jury verdict for the plaintiff Keys was a general verdict without the benefit of special interrogatories. "Where a complaint is divided into separate counts and a general verdict is returned, it will be presumed, if the charge and all rulings are correct on any count, that damages were assessed as to that count and the verdict will be sustained. *Sheeler* v. *Waterbury,* 138 Conn. 111, 114, 82 A.2d 359; see *Meglio* v. *Comeau,* 137 Conn. 551, 553, 79 A.2d 187." *Johnson* v. *Flammia,* 169 Conn. 491, 495, 363 A.2d 1048.

The inferences that may appropriately be drawn from a general verdict are significant in this case, because the jury might well have found for the plaintiff on the basis of his claim that the injuries sustained by him were a proximate result of the defendant's breach of its implied warranty of merchantability. The defendant's allegation in its special defense alleging that the plaintiff's injuries were caused by his own negligent operation of the vehicle in that "he was operating at too high a speed for the conditions" is not, as a matter of law, a defense to breach of implied warranty. *Schenck* v. *Pelkey,* 176 Conn. 245, 256, 405 A.2d 665; see *Brickman-Joy Corporation* v. *National Annealing Box Co.,* 459 F.2d 133 (2d Cir.); 1 Dooley, Modern Tort Law § 4.20; Epstein, "Products Liability: Defenses Based on Plaintiff's Conduct," 1968 Utah L. Rev. 267; see, generally, 1 Hursh & Bailey, American Law of Products Liability (2d Ed.) § 3.81. Consequently, the error, if any, in that portion of the charge relating to the alleged contributory negligence of the plaintiff was, in view of the general verdict, harmless. See *Keeler* v. *General Products, Inc.,* 137 Conn. 247, 251, 75 A.2d 486.

## IV

The defendant's final claim is that the court erred in refusing to set aside the verdicts as excessive. "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness. *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770; *Neal* v. *Shiels, Inc.,* 166 Conn. 3, 19, 347 A.2d 102. The test is 'whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.' *Raia* v. *Topehius,* 165 Conn. 231, 239, 332 A.2d 93. See also 22 Am. Jur. 2d, Death, § 178. On appeal, the conclusion of the trial court from the vantage point of the trial bench cannot be disturbed unless the court abused its discretion. *Birgel* v. *Heintz,* 163 Conn. 23, 27, 301 A.2d 249; *Fairbanks* v. *State* [143 Conn. 653, 661, 124 A.2d 893]." *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172.

Examining the evidence in the light most favorable to sustaining the verdicts, the jury could have found the following to be among the facts established: The injuries to the plaintiff Jon Sumpter consisted of a broken hand, glass embedded in his head, a blow to his head and scrapes and abrasions on his shoulders and legs. He continued to experience so much pain in his hand after his release from Bridgeport Hospital that he went to St. Francis Hospital in Hartford a few days later where they set his hand and placed it in a cast. Sumpter was a psychologist, and after the accident he was

absent from work for eight weeks, with total lost wages of $1692.32. The plaintiff Gerald Bush apparently became unconscious at the scene of the accident and had to be pried out of the car. He was taken to Bridgeport Hospital, where he remained for nine days, until September 11, 1973, with a head injury and a compound fracture of the elbow. Dr. Edward McCreery testified that he had to perform surgery to wire the bone fragments together, and that the wire would have to remain in Bush's elbow for the rest of his life. Bush's arm was in a cast from the upper arm to the base of the fingers for five weeks. He was then put in a plaster splint, or partial cast, for another two weeks. For three days after the accident he required injections of a pain-killing drug. At the time of trial, Bush's arm still hurt when he pulled or lifted heavy objects. He had lost some sensation in the elbow and could not completely extend his arm. Scars still marked Bush's arm and elbow and these were shown to the jury. Although Bush withdrew any claim for lost wages, he was not able to work or care for himself until November 5, 1973, two months after the accident.

As a result of striking his head on the windshield, Richard Keys sustained lacerations on the head, and a cerebral concussion. In addition, Keys sustained an injury to the seventh cervical vertebrae resulting in persistent, severe symptoms. Medical treatment for the cervical injury included a cervical collar and extensive physiotherapy. The injury to the cervical vertebrae resulted in fibrosis or scar tissue setting into the ligaments which left Keys with a 7½-10 percent permanent partial disability to the neck. As a result of the concussion sustained in the accident, Keys suffered from symptoms described as post-concussion syndrome, marked by

headaches, dizziness and superimposed anxiety or nervous reaction. Following the accident, Keys suffered daily headaches accompanied by dizziness and, while the headaches had gradually decreased in frequency at the time of the trial, the intensity of the attacks had increased, with attacks lasting up to twelve hours. Keys' personality underwent significant changes following the accident and he was described by an employer as a "nervous wreck" for approximately one year after the accident. Following the accident in which his nephew, Gerald Nichols, was killed, Keys withdrew from contact with people. Keys was still suffering from the post-concussion syndrome at the time of trial and the condition is expected to be permanent. This condition resulted in a permanent partial disability of 10 percent to Keys' ability to carry out everyday activities, including his ability to work. The injuries and permanent disabilities were causally connected to the accident and Keys had a stipulated life expectancy of 31.1 years.

Gerald Nichols was eighteen years old at the time of his death and had a life expectancy of 51 years. He enjoyed a close relationship with his family and the company of his friends, the other plaintiffs in this case. Nichols enjoyed working with children, was a good worker, and was very concerned with helping his family as much as he could. Although he had dropped out of high school and was earning $2 per hour at the time of his death, expert testimony was presented indicating that, considering the 43-year period of Nichol's working life expectancy, the present cash value of his lost earnings, using a wage of $2 per hour and deducting for necessary living expenses and income taxes, amounted to a net figure of $132,182. The destruction of the

plaintiff's capacity to carry on and enjoy life's activities was, of course, a consideration for the jury to assess in addition to his lost earning capacity. *Katsetos* v. *Nolan,* supra, 659.

Although the awards of damages may be considered liberal, it cannot be held as a matter of law that the trial court abused its discretion in refusing to set aside the verdicts. The size of the verdicts is not such as to shock the sense of justice and thus compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. *Raia* v. *Topehius,* 165 Conn. 231, 239, 332 A.2d 93.

There is no error.

In this opinion the other judges concurred.